IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF OKLAHOMA

LESLI ALLEN, )
)
    Plaintiff, )
)
) CIV-14-312-L
v. )
)
CAROLYN W. COLVIN, )
  Acting Commissioner of Social )
   Security Administration, )
)
    Defendant. )

REPORT AND RECOMMENDATION

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the final decision of Defendant Commissioner denying her application for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 416(I), 423. Defendant has answered the Complaint and filed the administrative record (hereinafter TR___), and the parties have briefed the issues. The matter has been referred to the undersigned Magistrate Judge for initial proceedings consistent with 28 U.S.C. § 636(b)(1)(B). For the following reasons, it is recommended that the Commissioner's decision be affirmed.

I. <u>Administrative History and Medical Evidence</u>

Plaintiff applied for benefits on October 12, 2010 (protective filing date), and alleged that she became disabled on June 30, 2010, due to bipolar disorder with anxiety, rheumatoid arthritis, asthma, scoliosis, hypertension, and cluster migraine headaches. (TR 99-100, 128).

1

Plaintiff has a high school education, and she previously worked as a plan benefit designer for an insurance company until she stopped working on June 30, 2010. (TR 129). The medical record reflects that Plaintiff underwent surgery in February 2008 to implant a sling for stress urinary incontinence. (TR 187). Plaintiff reported she was doing well following this operation. (TR 205, 206).

In September 2008, Plaintiff sought treatment from Dr. Arthur, a rheumatologist, for seropositive rheumatoid arthritis. (TR 235). Dr. Arthur noted that Plaintiff also had a medical history of cervical and lumbar spondylosis, patello femoral syndrome, and mild osteopenia. No medications were prescribed, and Plaintiff was encouraged to increase her neck and back exercises, do quad exercises, and use wrist splints at night for her report of some carpal tunnel symptoms.

Plaintiff began treatment in April 2009 with Dr. Gunda, a psychiatrist. (TR 250). Plaintiff sought medications for bipolar disorder and stated she had been in therapy for the past 30 years, had previously been treated by a psychiatrist with medications, had not had a manic episode for 13 years, and she had been stable on her medications. (TR 255). Plaintiff also reported she was working full-time and had two children. (TR 256). Dr. Gunda noted a mental status examination was essentially normal. Medications for bipolar disorder, mixed, were prescribed, including anti-depressant and anxiolytic medications. (TR 257).

Plaintiff returned to Dr. Gunda for medication management in August 2009, December, 2009, February 2010, April 2010, and September 2010. (TR 259-265). In April 2010, Dr. Gunda noted that Plaintiff's mental status examination was essentially normal and

she was advised to continue her medications. (TR 263). In September 2010, Dr. Gunda noted Plaintiff's report that she was feeling good and had a new boyfriend. In a mental status examination, Dr. Gunda noted Plaintiff's affect was appropriate, she was calm and euthymic (not depressed), and she exhibited normal speech. Dr. Gunda advised Plaintiff to continue her medications. (TR 265). In January 2011, Plaintiff returned to Dr. Gunda and reported that she was feeling sad because her boyfriend had died. Dr. Gunda noted that Plaintiff was depressed but she denied suicidal ideation. She was advised to continue her medications. (TR 307).

In December 2010, Plaintiff underwent a consultative psychological evaluation conducted by Dr. Repanshek, Psy.D., a licensed psychologist. (TR 268-271). Dr. Repanshek reported that Plaintiff's gross and fine motor movements were normal, she had no problem with psychomotor functioning, she did not appear distressed with sitting for 45 minutes, there were no deficits in Plaintiff's ability to concentrate, she was fully cooperative, and she exhibited good insight. Plaintiff reported she was depressed as her boyfriend of eight months died in November 2010 and she had a mental health history of bipolar disorder with generalized anxiety disorder beginning at age 16 or 17, with one prior attempted suicide in 1981, one prior inpatient mental health treatment in 1989, no counseling since the 1980s, and her last manic episode was three years earlier. She was taking anti-depressant and anti-anxiety medications, and she reported the medications were working. She reported she had about 25 friends and enjoyed going out to sing karaoke, going to concerts, researching on the internet, communicating with Facebook contacts, spending time with her friends, and

3

watching television. A mental status examination reportedly revealed no significant deficits except for depressed mood. The diagnostic impression was bipolar disorder II and bereavement. Dr. Repanshek noted in her report of the evaluation that "[t]here were some inconsistencies in [Plaintiff's] statements which contradicted her description of her anxiety symptoms. Furthermore, this inconsistency ma[de] an estimate of her current functioning difficult." (TR 270).

In consultative physical examination conducted in February 2011 by Dr. Le, Plaintiff reported she had a history of bipolar disorder for 30 years that had become more difficult to control, migraine headaches occurring three times per week, and rheumatoid arthritis. Plaintiff reported her employer had offered her medical retirement because of excessive absences due to migraine headaches and arthritis. She reported pain "all over" in her joints and that she was "often bedridden" due to migraine headaches. (TR 273). She reported she was taking thirteen medications.

Dr. Le noted that on examination Plaintiff was "able to get out of her chair easily and onto exam table without any difficulty," she exhibited full muscle strength, full grip strength, normal coordination and fine motor skills, normal gait, slight enlargement of her finger joints, some decreased range of motion in her left shoulder, and no mental deficits. (TR 274). The diagnostic assessment was bipolar disorder, migraine headaches, and rheumatoid arthritis. (TR 275).

Plaintiff was treated by Dr. Arthur for rheumatoid arthritis in March 2011, January 2012, February 2012, and March 2012. (TR 320-330). In January 2012, Dr. Arthur noted

Plaintiff complained of increased arthritis symptoms with pain, swelling, and tenderness in her ankles, knee, hips, and hands beginning the previous week. She had not previously been prescribed antirheumatic medications. She was taking non-narcotic pain and muscle relaxant medications and four medications for bipolar disorder. (TR 328).

Dr. Arthur noted a physical examination of Plaintiff was normal except for some tenderness in her cervical spine and some swelling in her wrists, fingers, and ankles without tenderness. She was started on antirheumatic medications. In follow-up treatment, Dr. Arthur noted in February 2012 that Plaintiff's arthritis was "significantly better" on the medications. In March 2012, Dr. Arthur noted that Plaintiff exhibited an "utterly normal musculoskeletal exam" and she was "doing much better" on the antirheumatic medications. (TR 321). Because of elevated liver function laboratory findings, Plaintiff's antirheumatic medication was switched to a different medication. Dr. Arthur also noted that Plaintiff's mental status was within normal limited in January 2012, February 2012, and March 2012. (TR 321, 324, 328).

Plaintiff presented to a hospital emergency room on August 19, 2011, and reported that she had ingested "40 Lunesta as a suicide attempt." (TR 317). She reported she was frustrated over the recent death of her fiancee about three months earlier, and she also reported "frequent blackouts with drinking alcohol." (TR 317). She was stabilized on medications for bipolar disorder and discharged five days later.

During this treatment period, Plaintiff was examined by Dr. Dalbir on August 20, 2011. (TR 313-315). Plaintiff complained to Dr. Dalbir of a history of migraine headaches

5

for which she took medications prescribed by her doctor "as needed." She also complained of a history of rheumatoid arthritis since age 13 that was not severe enough for disease-modifying antirheumatic medications. She reported occasional joint pain. She also reported a history of asthma with occasional shortness of breath for which she used daily inhaler medication. She reported a history of hypertension, but she was not taking her prescribed medication. Dr. Dalbir noted that a physical examination revealed normal gait and balance, normal sensory and motor function, no joint abnormalities, and no focal neurological deficits. (TR 314-315). Plaintiff was prescribed hypertension and anti-inflammatory medications.

There are records of continuing treatment of Plaintiff by Dr. Gunda in July 2011, September 2011, October 2011, December 2011, February 2012, and May 2012. (TR 334 - 339). In September 2011, Dr. Gunda noted Plaintiff stated she was "ashamed" of her recent suicide attempt. She was feeling better after starting Neurontin® and Vistaril® in the hospital. (TR 335). Dr. Gunda noted a mental status examination was normal, and Plaintiff was advised to continue her medications as needed. Her medications were adjusted in October 2011, February 2012, and May 2012.

At a hearing conducted on May 23, 2012, before Administrative Law Judge Wampler ("ALJ"), Plaintiff reported she was 47 years old, she "lost [her] job" on June 30, 2010, because she was missing one to two days of work per week due to migraine headaches, anxiety, and arthritis. She testified she was experiencing a "flare" of a previous methicillin-resistant staphylococcus aureus (MRSA) infection that had previously occurred "last year" from "January until April" and caused excoriations all over her body. (TR 31-32). Plaintiff

6

testified she had been mainly depressed over the past 15 years, that her depression was getting harder to control, and that she could not work because of malaise and lethargy due to rheumatoid arthritis and bipolar disorder. She also described difficulty with time management, morning stiffness and pain, and migraine headaches occurring three to four times per week.

II. ALJ's Decision

The ALJ issued a decision (TR 14-25) on August 3, 2012, in which the ALJ found that Plaintiff had severe impairments due to seropositive rheumatoid arthritis, obesity, and bipolar disorder. Despite these impairments, Plaintiff had the residual functional capacity ("RFC") to perform sedentary work except she was "only able to perform work where interpersonal contact is incidental to work performed; complexity of tasks is learned and performed by rote, few variables, and little judgment; and supervision required is simple, direct, and concrete." (TR 19). The ALJ found that Plaintiff was not capable of performing her previous job but, using Rule 201.21 of the agency's Medical-Vocational Guidelines as a "framework," Plaintiff could perform other jobs available in the economy, and "the additional limitations [described in the RFC] have little or no effect on the occupational base of unskilled sedentary work." (TR 24).

Based on these findings, the ALJ denied Plaintiff's application for benefits. The Appeals Council denied Plaintiff's request for review, and therefore the ALJ's decision is the final decision of the Commissioner. See 20 C.F.R. § 404.981; Wall v. Astrue, 561 F.3d 1048, 1051 (10th Cir. 2009).

III. General Legal Standards Guiding Judicial Review

The Court must determine whether the Commissioner's decision is supported by substantial evidence in the record and whether the correct legal standards were applied. Wilson v. Astrue, 602 F.3d 1136, 1140 (10th Cir. 2010); Doyal v. Barnhart, 331 F.3d 758, 760 (10th Cir. 2003). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. It requires more than a scintilla, but less than a preponderance." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). The "determination of whether the ALJ's ruling is supported by substantial evidence must be based upon the record taken as a whole. Consequently, [the Court must] remain mindful that evidence is not substantial if it is overwhelmed by other evidence in the record." Wall, 561 F.3d at 1052 (citations, internal quotation marks, and brackets omitted).

The Social Security Act authorizes payment of benefits to an individual with disabilities. 42 U.S.C. § 401 *et seq*. A disability is an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); accord, 42 U.S.C. § 1382c(a)(3)(A); see 20 C.F.R. § 416.909 (duration requirement). Both the "impairment" and the "inability" must be expected to last not less than twelve months. Barnhart v. Walton, 535 U.S. 212 (2002).

IV. Credibility

Plaintiff first contends that the ALJ erred in evaluating her credibility because the ALJ

"did not affirmatively link any of the factors to specific evidence." Plaintiff's Opening Brief, at 4. The assessment of a claimant's RFC at step four generally requires the ALJ to "make a finding about the credibility of the [claimant's] statements about [her] symptom(s) and [their] functional effects." Social Security Ruling ("SSR") 96-7p, 1996 WL 374186, at * 1 (1996). "Credibility determinations are peculiarly within the province of the finder of fact, and [courts] will not upset such determinations when supported by substantial evidence." Diaz v. Secretary of Health & Human Servs., 898 F.2d 774, 777 (10th Cir. 1990). In determining a claimant's credibility, an ALJ must "consider the entire case record and give specific reasons for the weight given to the individual's statements.". SSR 96-7p, 1996 WL 374186, at * 4 (1996). Credibility findings must "be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." McGoffin v. Barnhart, 288 F.3d 1248, 1254 (10th Cir. 2002)(quotations and alteration omitted).

In addition to objective evidence, the ALJ should consider certain factors in evaluating a claimant's credibility, including the claimant's daily activities; the location, duration, and intensity of the claimant's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; any treatment other than medications the individual receives or has received for pain or other symptoms; any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p, 1996 WL 374186, at * 3. See Hamlin

9

v. Barnhart, 365 F.3d 1208, 1220 (10th Cir. 2004)(stating ALJs "should consider" factors set forth in SSR 96-7p). An ALJ is not, however, required to conduct a "formalistic factor-by-factor recitation of the evidence." Qualls v. Apfel, 206 F.3d 1368, 1372 (10th Cir. 2000). Employing "common sense" as a guide, the ALJ's decision is sufficient if it "sets forth the specific evidence he [or she] relies on in evaluating the claimant's credibility." Id.; Keyes-Zachary v. Astrue, 695 F.3d 1156, 1167 (10th Cir. 2012).

In this case, the ALJ's evaluation of Plaintiff's credibility was not deficient. First, the ALJ stated the general conclusion that Plaintiff's "statements concerning the intensity, persistence and limiting effects of [her] symptoms] are not credible to the extent they are inconsistent with the above [RFC] assessment." (TR 20). The ALJ did not stop with this conclusion, however, and discussed several relevant factors in the decision, including inconsistencies between the objective medical evidence and Plaintiff's allegations of disabling pain and limitations, the gap in Plaintiff's medical treatment for rheumatoid arthritis between September 2008 and March 2011, the absence of medications for treatment of rheumatoid arthritis until January 2012, Plaintiff's report that the medications were effective in reducing her symptoms, the minimal physical findings in the report of the consultative examiner, Dr. Le, of his consultative physical examination of Plaintiff conducted in February 2011, the Plaintiff's treating physician's report in March 2012 that Plaintiff's physical examination was normal, the absence of evidence that Plaintiff sought medical treatment for rheumatoid arthritis after March 2012, Plaintiff's report in May 2009 that she was stable on medications for her bipolar disorder, the absence of abnormal mental status

10

findings in April 2010, the lack of abnormal mental status findings in the report of the consultative psychological examiner, Dr. Repanshek, Dr. Repanshek's statement indicating Plaintiff had made inconsistent statements, suggesting she was less than credible[1], and other medical evidence the ALJ reasoned showed "her symptoms seem to be stabilized and controlled with appropriate medications and adjustments." (TR 22).

The ALJ also considered Plaintiff's daily activities, including her report that she was "able to maintain sufficient attention to play video games and play on the computer," as well as perform various other daily activities such as preparing simple meals, doing laundry, performing household chores, and driving, and the ALJ reasoned these activities reflected her "statements concerning her impairments and the limiting effects are not fully credible as the evidence of record as a whole does not support them." (TR 22). The ALJ further considered the medical opinions of record, including Dr. Repanshek's assessment that Plaintiff's global assessment of functioning ("GAF") score was 55 to 65 at the time of the consultative evaluation, indicating only moderate symptoms. The ALJ also properly considered the agency medical consultants' assessments of the severity of Plaintiff's physical and mental impairments and her RFC for work, none of whom found Plaintiff was disabled.

---

[1] Plaintiff's argument that Dr. Repanshek's statement did not indicate Plaintiff was less than credible is disingenuous. Dr. Repanshek's report clearly set forth the inconsistencies in Plaintiff's statements to the examiner. See TR 268, 270. Dr. Repanshek clearly stated in her report of the consultative evaluation of Plaintiff that there were "some inconsistencies" in Plaintiff's statements that "contradicted her description of her anxiety symptoms" and that the inconsistencies make it difficult to assess her current level of functioning. (TR 270). The ALJ did not err in relying on this statement as an indicator that Plaintiff was less than credible in describing the presence and severity of her symptoms.

Contrary to Plaintiff's argument that the ALJ relied solely on "boilerplate" language or "pre-determined" her RFC before assessing her credibility, the ALJ provided specific reasons that are well supported by the record for discounting the credibility of Plaintiff's disabling pain complaints. Further, no error occurred in the ALJ's evaluation of the evidence with respect to the step four credibility determination.

V. Evaluation of Medical Source Statements

Plaintiff next contends that the ALJ erred in analyzing the medical opinions in the record. Generally, a treating physician's opinion is entitled to controlling weight if it is supported by medically acceptable clinical and laboratory diagnostic techniques. Watkins v. Barnhart, 350 F.3d 1297, 1300 (10th Cir. 2003) (quoting Social Security Ruling 96-2p, 1996 WL 374188, at *2). However, "[m]edical evidence may be discounted if it is internally inconsistent or inconsistent with other evidence." Pisciotta v. Astrue, 500 F.3d 1074, 1078 (10th Cir. 2007)(internal quotation marks omitted). When an ALJ finds that a treating physician's opinion is not entitled to controlling weight, the ALJ must decide "whether the opinion should be rejected altogether or assigned some lesser weight." Id. at 1077.

"Treating source medical opinions not entitled to controlling weight 'are still entitled to deference' and must be evaluated in light of the factors in the relevant regulations, 20 C.F.R. §§ 404.1527 and 416.927." Newbold v. Colvin, 718 F.3d. 1257, 1265 (10th Cir. 2013)(quoting Watkins, 350 F.3d at 1300). The ALJ is required to consider all medical opinions in the record. 20 C.F.R. § 404.1527©. An ALJ must also discuss the weight assigned to each medical opinion. Id. § 404.1527(e)(2)(ii). There are specific factors that the

ALJ should consider in determining what weight to give to a medical opinion. Id. § 404.1527(c).

The ALJ's decision reflects his consideration of the opinions of Plaintiff's treating physicians as well as the opinions of the consultative examiners and the agency's medical consultants. The ALJ stated that he accorded "little weight" to the opinion of Plaintiff's treating physician at St. Anthony Hospital at the time of her discharge from inpatient mental health treatment on August 24, 2011. (TR 22). The treating physician, Dr. Vad, stated that Plaintiff had a GAF score of 45 at that time. (TR 317). The ALJ reasoned that this score indicated serious symptoms or serious impairment in social, occupational, or school functioning, but that the opinion was "made just 5 days after claimant had attempted suicide" and the treatment record showed Plaintiff "responded fairly well to medications during the hospitalization." (TR 22-23). Also, the ALJ noted Plaintiff's own reports in October 2011 and December 2011 that she was feeling better. (TR 23, 336, 337). The ALJ's decision provides reasons for giving "little weight" to Dr. Vad's one-time GAF assessment based on relevant factors, including the consistency between Dr. Vad's opinion and the record as a whole. No error occurred with respect to the ALJ's evaluation of Dr. Vad's GAF assessment made at the time of Plaintiff's discharge from her five-day hospitalization for inpatient mental health treatment.

The ALJ stated that he accorded "significant weight" to the opinion of Dr. Repanshek who assessed Plaintiff with a GAF rating of 55 to 65 at the time of the consultative psychological evaluation. The ALJ reasoned that this GAF rating indicated moderate

13

symptoms and that the opinion was consistent with other evidence in the record showing Plaintiff had responded well to her medications prescribed to treat her bipolar disorder. (TR 23). As the ALJ's decision provides reasons that are well supported by the evidence for the weight given to the opinions of Plaintiff's treating and consultative examining physicians, no error occurred with respect to the ALJ's evaluation of this medical opinion evidence.

Plaintiff argues that the opinions of the state agency medical consultants were "stale" because the record of her inpatient mental health treatment occurred after these opinions were rendered. Plaintiff asserts that the ALJ therefore erred in giving great weight to these opinions.

In the ALJ's decision, the ALJ stated that he accorded "significant weight" to the opinions of the state agency medical consultants concerning Plaintiff's mental RFC for work. The ALJ stated that he had "considered the evidence of record as a whole and [found] that the state agency examiners' assessment of the claimant's mental [RFC] is well supported." (TR 23).

Plaintiff argues that her "condition had obviously worsened as proven by her hospital stay" after the agency medical consultants had rendered their opinions. The mental RFC assessment made by Dr. Millican-Wynn is dated March 1, 2011. (TR 280-282). This RFC assessment was affirmed as written by Corine Samwel, Ph.D., on May 12, 2011. (TR 311). It is true that these mental RFC assessments were made some months prior to Plaintiff's inpatient mental health treatment that occurred in August 2011. (TR 313). However, the ALJ stated that he based his evaluation of the agency medical consultants' assessments on the

entire record, and not merely the record that pre-dated Plaintiff's record of inpatient mental health treatment.

Although Plaintiff argues that her mental issues had "changed substantially" after the state agency medical consultants' RFC assessments, Plaintiff does not point to specific evidence indicating that Plaintiff's mental condition showed persistent or prolonged deterioration after the dates of the medical consultants' RFC assessments. The record reflects that although Plaintiff sought treatment for depression in August 2011, her treating physician reported that she quickly responded to medications and was discharged only five days later. Plaintiff herself sought to be discharged from the mental health hospital, and the treatment record reflects that Plaintiff was stabilized on medications at the time of her discharge. (TR 317). As the ALJ pointed out, subsequent treatment records indicated Plaintiff's mental status improved following her brief hospitalization. (TR 335, 336, 337). The ALJ provided reasons that are well supported by the record for according "significant" weight to the mental RFC assessments by Dr. Millican-Wynn and Dr. Samwel.

There is substantial evidence in the record to support the Commissioner's decision denying Plaintiff's application for benefits, and the Commissioner's decision should be affirmed.

## RECOMMENDATION

In view of the foregoing findings, it is recommended that judgment enter AFFIRMING the decision of the Commissioner to deny Plaintiff's applications for benefits. The parties are advised of their respective right to file an objection to this Report and

Recommendation with the Clerk of this Court on or before _____March 30th__, 2015, in accordance with 28 U.S.C. § 636 and Fed. R. Civ. P. 72. The failure to timely object to this Report and Recommendation would waive appellate review of the recommended ruling. Moore v. United States, 950 F.2d 656 (10th Cir. 1991); cf. Marshall v. Chater, 75 F.3d 1421, 1426 (10th Cir. 1996)("Issues raised for the first time in objections to the magistrate judge's recommendation are deemed waived.").

This Report and Recommendation disposes of all issues referred to the undersigned Magistrate Judge in the captioned matter, and any pending motion not specifically addressed herein is denied.

ENTERED this ____10th____ day of _____March__, 2015.

GARY M. PURCELL
UNITED STATES MAGISTRATE JUDGE